Receipt number AUSFCC-7651377

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

)
H&M ASSOCIATES, LLC                )
                                   )
    *Plaintiff*              )        Civil Action No.__22-110 C__
                                   )
      v.                 )
                                   )
THE UNITED STATES OF AMERICA,      )
                                   )
    *Defendant*              )
_____)

### COMPLAINT

H&M Associates, LLC, ("Plaintiff" or "H&M") brings this complaint against the United States of America acting through the Department of the Air Force ("Defendant", "Government", or "USAF") and alleges the following:

### I.    NATURE OF THE ACTION

Plaintiff, a U.S. Government contractor and contract awardee, brings this action against Defendant because Defendant improperly terminated for default contract number FA301620C0116, B-Plant Chiller Replacement for B10056 ("contract") on July 20, 2021. In addition, Defendant violated federal procurement laws in the process and the default was excused by the Defendant's own fault.

### II.    PARTIES

1.  H&M is an active domestic corporation and a small business Government contractor incorporated in Pennsylvania. It has approximately one full-time employee.

2.  The United States of America in this matter is acting through the Department of the Air Force, 502 CONS, 1655 Selfridge Ave., Bldg. 5450, Joint Base San Antonio, Lackland, Texas 78236.

### III.   JURISDICTION

3.  The Tucker Act confers jurisdiction on the Court of Federal Claims over claims arising under the Contract Disputes Act of 1978 ("CDA"). See 28 U.S.C. § 1491; 41 U.S.C. §§ 7101–7109. "The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 [the Contract Disputes Act], ... on which a decision of the contracting officer has been issued under section 6 of that Act." 28 U.S.C. § 1491(a)(2). Included within this jurisdiction is the Court's power to "render a declaratory judgment regarding the propriety of a default termination." *C.D. Hayes, Inc. v. United States*, 74 Fed. Cl. 699, 705 (2006)

4.  Plaintiff was awarded the contract and stood to gain profits from it had Plaintiff been allowed to perform the contract. The contract was terminated because of Defendant's unreasonable actions.

5.  In addition, jurisdiction is vested in the Court over the appeal of the contracting officer's ("CO") final decision, dated July 20, 2021. The Defendant's decision to terminate the contract under the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109 was not supported by the evidence.

6.  Under the Contract Disputes Act, the court reviews a contracting officer's decision de novo. See 41 U.S.C. § 7104(b)(4) (2012).

## IV.    STATEMENT OF FACTS

7.  On August 13, 2020, the USAF issued Solicitation number FA301620B0009 as a sealed bid procurement to replace B-PLANT CHILLER B10056 on JBSA – Lackland, San Antonio, Texas.

8.  The project was 100% set-aside for Women Owned Small Business, NAICS Code 238220.

9.  The CO for the procurement was Andrew S. Sorensen.

10.  The Government estimated the magnitude of the project at between $500,000.00 and $1,000,000.00.

11.  The work requirements included demolition and replacement of the Centrifugal chiller, DDC EMCS, pumps, and of limited piping, hangars, electrical circuits and components, appurtenances and incidental related work.

12.  The contract was a fixed price contract and was awarded to Plaintiff on September 30, 2020.

13.  The contract required Plaintiff to deliver to Defendant all labor, equipment and materials to demolish and replace a Centrifugal Trane Chiller along with various components and appurtenances as noted in the Statement of Work Rev, dated September 17, 2020.

14.  The contract delivery schedule required delivery of design and submittal of long lead items on or before 100 days after receipt of the Notice to Proceed ("NTP"). It also required the installation of the replacement Trane Chiller on or before 120 days after receipt of the NTP, and completion of all Close out Activities on or before 30 days after receipt of NTP as set forth in FAR 52.211-10 "Commencement, Prosecution, and Completion of Work."

15. The Solicitation included 52.211-12 Liquidated Damages-Construction, which included:

| "CLIN | MILESTONES/ACTIVITIES DELIVERY DATE | AMOUNT |
| --- | --- | --- |
| 0001 | Administrative Period 100 Days from NTP | $715.00 |
| 0001 | Construction 120 Days from NTP | $715.00 |
| 0001 | Close Out Activities 30 Days after NTP | $715.00…" |

3

16.  The Solicitation included clause 252.236-7001 Contract Drawings and Specifications. 2000-08(a), which states, "CONTRACT DRAWINGS AND SPECIFICATIONS (AUG 2000)

(a) The Government will provide to the Contractor, without charge, one set of contract drawings and specifications, except publications incorporated into the technical provisions by reference, in electronic or paper media as chosen by the Contracting Officer." (Solicitation, page 28)

17.  The Solicitation includes clause concerning Site Visit (Construction) (Feb 1995), which states, "(b) An organized site visit will not be conducted due to current COVID-19 conditions. However, a virtual site visit is provided …."

18.  On October 6, 2020, a pre-construction meeting was held.

19.  On October 7, 2020 there was a site visit by Plaintiff, San- Antonio TRANE Representative, Local Installers, Riggers & Crane services, and Electricians.

20.  On October 8, 2020, bilateral Modification P0001 was issued to "Align CLIN 0001 POP with the Partial NTP for Administrative & Design efforts."  (see Mod P0001)

21.  The Period of Performance is "10/13/2020 to 10/20/2021" (see Mod P0001)

22.  On October 9, 2020 the U.S. Air Force CO issued a Partial NTP,

> "…for Administrative and Design Efforts necessary to carry out work prescribed in subject contract, including approval of drawings (per Section 01 11 00; para 1.2.1) and submittals for any long lead items or item requiring approval prior to construction. Allotted performance is **100** calendar days effective from Tuesday 13 October 2020; the completion date for these activities is **Wednesday 20 January 2021**."

This is the only NTP Defendant issued.

23.  On October 12, 2020 Plaintiff provided performance and payment bonds.

24.  Between October 18, 2020 and November 18, 2020, Ms. Mandal – owner of H&M, and representing the contractor – was in India due to her mother's head injury and subsequent death. Ms. Mandal informed Defendant about it.

25.  Between November 18 through December 1, 2021, Ms. Mandal tried to call Defendant and specifically Lauren Kallen Harper, and the CO, but their voicemailboxes were full.

26.  According to the termination notice, dated 20 July 2021, Plaintiff received a copy of the contract on or about 30 September 2020, thereby establishing 20 January 2020 as the delivery date for the Design and Submittal Activities.

27.  According to the termination notice, Defendant issued a Cure Notice (dated 11 January 2021), Letter of Concern (dated 22 January 2020), and Show Cause Notice (dated 8 February 2020) to notify Plaintiff about alleged delinquent performance and its obligations under contract.

28.  The Government's termination notice also stated that H&M failed to demonstrate adequate performance or intent to continue performance resulting in failure to provide the services required within the specified time in the contract.

29.  The Termination Contracting Officer ("TCO") alleged that Plaintiff failed to complete the requirements of the contract within the time required by the contract terms. TCO also argued that the alleged failure did not arise out of causes beyond Plaintiff's control or without Plaintiff's fault or negligence.

30.  The TCO then terminated the contract in its entirety.

31.  H&M submitted Requests for Information ("RFIs") to the Government, including:

> **RFI 1** – Submitted on December 2, 2020, this RFI generally concerned required supply and return temperatures to be used with the new chilled water storage tank; DCC sequence of operations for the new chiller plant; EMCS central graphic for water cooled plants to ensure that required points are mapped over correctly. It also concerned desired dimensions of the opening to the room that currently housed the chiller to be replaced… H&M indicated that it intended to replace the existing door with a pull-down garage style door. This RFI requested the desirable configuration of TRANE chiller that the Government would want to install in its facility. The configurations were to be specified with the TRANE manufacturer at the time of order for factory settings. It also pointed out that

prior approval in a written format from agency was extremely necessary and that based on the settings, all parts were to be customized in the chiller. Usually, these details were provided along with the product specification in the Scope of Work, but no such information was present in the contract.

**RFI 2** – Submitted on December 4, 2020. It generally concerned information about make and model numbers for motors be replaced, as the model numbers were unreadable from the photos. This RFI pertained to information on the make and models for the pump motors that needed replacement. It pointed out that the existing labels on the motors were either unreadable, missing or damaged, to the extent that the supply houses were not able to extract the make and model names as they were beyond recognition. Without full mechanical details on the existing motor, it was impossible to find a proper replacement. H&M also expressed its concern that the heavy-duty motors would have to shipped to mechanical shops out of the base, do its research and then advise Government with the replacement, which would require far more additional time and budgetary allocation. The Government responded on January 8, 2021. H&M reviewed the responses and concluded that the response was inadequate. The Government's answer suggested that the Government did not know either what the make and model for the motors were in the facility, nor did they know what they need to be replaced with. H&M was aware that motor information was extremely important to proceed with placing submittals and subsequent orders.

**RFI 3** – Submitted on December 18, 2020. This RFI generally asked whether the building at JBSA Lackland had an OPEN license for the Existing Niagara System (JACE). This RFI pertained to system configuration. This was a supplier question from TRANE. The bac net could be used by TRANE or Johnson-York Controls system, but it required an answer as to whether it is an open license or not.

**RFI 4** – On or about January 7, 2021 H&M submitted RFI- 0004 which pertained to motors that needed replacement. Since, RFI -0002 was not being adequately answered by the Government on January 7, 2021, H&M attempted to get some answers with more focused questions. With RFI 4, H&M sent photos along with the email so that the facilities manager could get an idea as to what the problems are being faced. It was only answered on January 14, 2021, after the Government issued a cure notice to H&M, dated

January 11, 2021, where the Government blamed H&M for all the delays.

32.  From December 4, 2020 through January 7, 2021, H&M sent various emails to Defendant asking Defendant for responses to its requests for information.

33.  On December 10, 2020, H&M submitted First Set of submittals for the chiller and provided Variable Frequency Drive ("VFD"), otherwise known as Variable Speed Drive ("VSD"), despite the fact that RFI 1 had not been responded to.  Two days later, Defendant required H&M to resubmit the submittals with a cover letter.  The CO later could not find the submittals; consequently H&M had to resubmit them again.

34.  On January 8, 2021, H&M communicated to the Government that RFIs 1 through 4 "were submitted with NO responses yet from your end."

35.  H&M's January 8, 2021 communication to the Government also stated that,

> "As time is of concern here, I am unable to place a purchase order with the TRANE unless the submittals are approved by you.  More so, because the Scope of Work does not provide any specifications for the chiller equipment to know what exactly the government wants, hence as the designated contractor, I feel less confident in placing the purchase order.  I have been informed by TRANE representative, Mr. Paul Mitchell, also cc'd in the email that the prices will increase next week.  In such a scenario, I would be left with limited options, that may not be favorable to both the parties – government and H & M.  Hence, I am requesting to expedite the approvals for the Chiller and VFD submittals and responses to the 4 RFIs, so that we can move forward with this contract."

36.  On January 8, 2021, the Government provided responses to RFI 1, 2 and 3.  H&M's Chiller submittals were not yet approved by the Government.

37.  On or about January 11, 2021, CO surprisingly issued H&M a Cure Notice, with a short response deadline of only 3 days.

38.  On January 11, 2021, Plaintiff responded to the Cure Notice in an email addressed to A1C

Tyler Hurley, Contract Administrator, and the CO.

39.  In the January 11, 2021 response, Plaintiff provided three available dates to further discuss

the matter and also made it clear that,

> "Previous emails from H&M to the government between 1/6/2020 and 1/8/2020
> highlighting that responses to RFIs and submittals are not being provided from the
> government, and that as a result timely delivery of this project will be difficult."

40.  The January 11, 2021 response also made it clear that H&M had asked for updates many

times, but never received any responses from any of the 4 or 5 listed email addresses; that H&M

tried calling, but calls would to go to the answering machines, which would be either full or

nobody got back to H&M.

41.  In its January 11, 2021 cure notice response, H&M also elaborated that the contract did not

offer **product specifications for the heavy ticket items** such as the TRANE chiller and its

configuration, DDC sequence, Variable frequency drive etc., and that without receiving the

approvals or the responses to the RFIs first, it is too RISKY on the general contractor (H&M) to

proceed with a half a million dollar purchase from TRANE for just one item - the Chiller.

42.  On January 11, 2021, H&M for the first time learned that that the local installer at San

Antonio somehow already knew about the CURE Notice issued to H&M.  The next day, H&M

had to begin contacting other installers, as previously recruited installers and most other

installers also somehow appeared to already know about the CURE notice.  H&M was finally

able to contact an installer from Austin, Texas.  Later, when H&M brought the information leak

to the attention of the CO, he alleged he did not know how that happened, and apparently did

nothing at all to find out how this damaging and sensitive information was released.

43. In an effort to further perform and comply with the requirements to the best of its ability, H&M requested a base pass for its potential new installer on January 13, 2021.

44.  A cure meeting was held on January 13, 2021.

45.  On January 14, 2021, Ms. Mandal contacted L. Payne, at the SBA, in an attempt to get assistance with the Cure Notice, and to find out what her options are to find a way to resolve the situation.

46.  On the afternoon of January 19, 2021, the CO called Ms. Mandal.  Based on the call, Ms. Mandal remarked the following: "I would say the tone was not amicable rather trying to put the blame on me [Ms. Mandal], and at one point he [Mr. Sorensen] seemed to suggest that I don't know what I am doing." Ms. Mandal then sent an email to L. Payne, SBA, to try to find out what was happening.

47.  On January 19, 2021, H&M sent an email to the CO, asking for an updated submittal list. There was discussion about the submittal list from the pre-construction conference, Attachment 16, which included a "dig permit" from a different project, that was mislabeled. The CO referred Ms. Mandal to Attachment 2 of the contract, a draft Material Submittal, and told her to ask for recommendations from her subcontractors and suppliers.  Without any effort to cooperate, the CO refused to provide the list she requested.

48.  On January 22, 2021, the CO issued to Plaintiff a letter of concern alleging that Plaintiff had delayed the contract and could be assessed liquidated damages and that Plaintiff's "...failure to take corrective actions to cure performance would leave the government without any other alternative but to exercise its rights under FAR clause 52.249-10 "Default (Fixed Price Construction)."

49. As of January 22, 2021 the Government still did not provide the missing information requested by H&M in order for H&M to move forward with performance.

50.  Despite never responding to H&M's request for information, the Government's letter of concern continued to allege that H&M was still delinquent with various submittals for approval that should have been completed within the 100 days allocated on the NTP.

51.  The Government's letter of concern admits that the Government was responsible for delaying H&M response to Submittal 0001 that was submitted by H&M on 21 December 2020 and was eventually returned to H&M on 14 January 2021.

52. The Government's letter also openly admits that the Government also delayed H&M's RFIs 0001 – 0004 but suggests that some of the information requested by H&M should be information obtained as part of your field investigation as well as determinations made by your team /subcontractors.

53. The CO still did not provide the requested information to H&M.

54. The Government's January 22, 2021 letter of concern openly admitted partial responsibility for being untimely to H&M's responses.

55. The Government's January 22, 2021 letter also told H&M that is expected to accelerate performance to mitigate unsatisfactory progress.

56. Despite giving H&M an additional thirty-seven days (37) to the period of performance, the Government still did not provide H&M material information needed to perform.

57. On January 27, 2021, H&M responded to the January 11, 2021 cure notice.

58. On January 28, 2021, Ms. Mandal responded to the CO by requesting an "Equity Adjustment" because while the Government delayed responding to H&M's RFIs and delayed

approving H&M's submittals, all mechanical company, parts and fabricators have since raised their prices, and no one wanted to honor their previously quoted prices.

59. For TRANE chiller, the revised cost was $ 1,010,000.00. Alternatively, installing a competitive chiller such as York with identical chiller specs (to that of TRANE) would cost $810,000.00.

60. In the alternative, H&M asked the CO to terminate the contract for convenience, which he refused to do.

61. On January 28, 2021, the CO responded to H&M's request for "equity adjustment or termination for convenience" by requesting documentation for the equity adjustment, denying the request for termination for convenience, refusing to advise H&M about the consequences of termination for default, and referring H&M to their SBA representative.

62. As of January 28, 2021, the Government still had not provided the requested information to H&M.

63. On February 8, 2021, the CO issued a show cause notice, stating, "Since you have failed to cure the conditions endangering performance under Contract No FA301620C0116 as described to you in the Government's Cure Notice (issued 11 Dec 2021) and follow-up Letter of Concern (issued 22 Jan 2021), the Government is considering terminating the contract under the provisions for default of this contract."

64. On April 21, 2021, H&M communicated with the CO to show that H&M intended to, and still continued to comply with the terms and conditions of the contract. The contents of said communication are incorporated by reference.

65.  H&M's April 21, 2021 email also advised the Government that much of the information that H&M needed to receive in a timely fashion was not readily available to it and there seemed to be a disconnect with getting information from the Government.

66.  The April 21, 2021 email notified the Government that the Government's delay in getting the important information to H&M would cause a steep price increase in the equipment.

67.  H&M proposed to install the brand name brand Johnson Controls-YORK.

68.  The contract allowed the contractor to provide either a Trane brand or Johnson Controls - York.

69.  Additionally, the April 21, 2021 email to the CO stated that H&M could do the job without the CO issuing additional money, which would be in the interest of the Government and that once the Government agrees, H&M could move quickly to place orders and get the full work completed in 22-24 weeks' time frame.

70.  The Government failed to respond to H&M's April 21, 2021 email or reasonably consider H&M's proposal despite the Government-caused delays that were not excused.

71. The Government also failed to act or investigate how information regarding the Government's actions against H&M, including the cure notice, came into possession of outside sources such as local supplier's, installers, manufacturers etc.

72.  On July 20, 2021, the CO issued Modification P00002, terminating the contract for default, in its entirety.

# V.   **CAUSES OF ACTION**

CAUSE I (The Defendant's Actions and Failure to Respond to Plaintiff's Repeated
Requests for Critical Information Contributed to Delays and Ultimately the Default)

73.  Plaintiff re-alleges and incorporates by reference the paragraphs set forth above as if each were separately restated here.

74.  The record shows that H&M can demonstrate that the default was primarily caused by improper Government actions including repeated failures to give H&M necessary and critical information, that was the primary or controlling cause of the default.

75.  If the Government had responded to H&M in a timely fashion and provided the information which was in the Government's possession, H&M's performance on time was well within its reach.

76.  H&M would have made substantial progress under the contract and due to the Government's repeated admitted failure to timely respond to H&M's concerns it was entitled to significant additional extensions of time over and beyond the original completion dates now established by the government.

77. As a direct result of the Government's delay and leak of information, which the Government failed to reasonably investigate, vendors dramatically increased prices and this was outside of H&M's control.

78.  The Government's delays were not excusable, and Government-caused delays were on the critical path for work under the contract. As such, the CO's decision to terminate H&M's contract for default was inappropriate under *Darwin Construction Co. v. United States*, 811 F.2d 593 (Fed. Cir. 1987).

<u>CAUSE II (Abuse of Discretion and Failure to Reasonably Follow FAR Requirements When Terminating for Default)</u>

79. Plaintiff re-alleges and incorporates by reference the paragraphs set forth above as if each were separately restated here.

80. Under the facts of this case, the CO failed to exercise sound discretion and did not possess adequate grounds to terminate the H&M for default.

81.  The Government cannot meet its burden of proof on the issue of correctness of its actions in terminating the contract for default. Contrary to the rationale stated in the termination letter, the failure of a contractor to satisfy contract performance requirements alone is insufficient to support a termination for default.

82.  The CO failed to look beyond the mere default and failed to consider the other interests of the Government when deciding whether to terminate a contract.

83.  The FAR requirements are not discretionary for the CO.

84.  The CO failed to consider all factors and to document the record showing compliance with the FAR's mandatory requirements. See also See *William A. Hulett* AGBCA 91-230-3 et al., 93-1 BCA 11 25389; *Precision Dynamics, Inc.*, ASBCA 42955, 97-1 BCA 11 28846. See also *Minelli v. U.S.*, 61 F.3d 920 (Fed. Cir. 1995).

85.  FAR 49.402-3 governs the process for and considerations involved in an Agency issuing a termination for default. Specifically, FAR 49.402-3(f)(1)–(7) lists the following factors that the contracting officer must consider before issuing a termination for default:

> (1) The terms of the contract and applicable laws and regulations; (2) the specific failure of the contractor and the excuses for the failure; (3) the availability of the supplies or services from other sources; (4) the urgency of the need for the supplies or services and the period of time required to obtain them from other sources, as compared with the time delivery could be obtained from the delinquent contractor; (5) the degree of essentiality of the contractor in the Government acquisition program and the effect of a termination for default upon the contractor's capability as a supplier under other contracts; (6) the

14

effect of a termination for default on the ability of the contractor to liquidate guaranteed loans, progress payments, or advance payments; (7) any other pertinent facts and circumstances.

48 C.F.R. § 49.402-3(f)(1)–(7).

86.  There was no reasonable belief on the part of the CO that there was no reasonable likelihood that the H&M could perform the entire contract within the time remaining for contract performance. In addition, the CO contributed to the delays by not cooperating with H&M when it requested material information to be able to perform the contract.

87. If the CO had reasonably considered all facts and circumstances and reasonably applied the Federal Acquisition Regulation to the facts of this case, including the Government's admitted delays, the information leak, and the Government's failure to provide material information causing a situation where H&M performance possibility was impeded and delayed, then it is likely that the CO would not have issued a default termination.

88. The Government cannot show that there was another contractor that could have delivered and performed in the time frame and at lower cost than H&M based on the changed market conditions affected by the information leak.

89. The CO also abused his discretion to terminate for default because the CO stated that the reason for termination was failure to satisfy contract requirements. The CO was not mandated to terminate since the "default clause" only suggests that the CO "may" terminate. Here, the CO did not look beyond the mere default and consider other interests of the Government when deciding whether to terminate the contract. For example, the Government cannot show that another contractor could have performed the contract in the unreasonable thirty-seven days (37) given to H&M despite H&M offering to perform the work at no additional cost to the Government and in a 22-44 week timeframe.  Such an abuse is grounds for the court to set aside the default.

15

90.  The CO simply used his subjective opinion as stated in his termination notice. See also *McDonnell Douglas Corp. v. United States (McDonnell Douglas XII),* 323 F.3d 1006 (Fed. Cir. 2003) (citing *Lisbon Contractors, Inc., v. United States*, 828 F.2d 765-66).

91.  The Government also failed to consider whether H&M would complete the contract at least as soon as and probably much sooner than a successor contractor could have performed the unfinished work if the Government had provided the material information repeatedly requested by H&M. See also *Darwin Constr. Co. v. United States*, 811 F.2d 593, 599 (Fed. Cir. 1987). This failure proved costly to the Government.

92.  The CO failed to consider that even if H&M was behind schedule, that by itself was not enough to satisfy the requirements of a termination for default as set out in *Lisbon Contractors, Inc.*. The Government cannot "satisfy its burden by merely showing that the contractor was behind schedule." *McDonnell Douglas XII*, 323 F.3d at 1016 (citing *Lisbon*, 828 F.2d at 765–66).

93.  The Government's the default termination was defective and it failed to properly consider and document how H&M could not finish the project.

94.  The CO exercised no independent discretion in making the termination decision.

95. The CO failed to exercise his discretion when terminating the contract for default because it appears that the brunt of the decision to terminate came from someone outside of the contracting office.

CAUSE III (Breach of the Duty Of Good Faith and Fair Dealing Not to Interfere)

96.  Plaintiff re-alleges and incorporates by reference the paragraphs set forth above as if each were separately restated here.

97.  The covenant of good faith and fair dealing in its administration of the contract requires under common law that Defendant not to interfere with Plaintiff's performance and does not act to destroy Plaintiff's reasonable expectations regarding the fruits of the contract.

98.  H&M had a reasonable expectation that the Government would provide critical information as requested by H&M that was essential to H&M's prompt performance under the contract.

99.  Defendant failed to reasonably provide material information possessed by the Defendant and interfered and hindered performance by failing to provide said information. Providing this information differs from the allegations underlying the accompanying breach of contract claim.

100.  The information still required by H&M, which was in possession of the Government and it was never provided to Plaintiff and was the proximate reason why H&M could not place orders on such high-priced items. H&M repeatedly advised the Government about this fact.

101. The Government, despite twice admitting in the record that it delayed H&M's RFIs response, failed to realize that such delays were not excusable simply because the Government was the contracting party making a self-serving decision to only award H&M thirty-seven days (37) to finish performance while it conveniently attempted to avoid the fact that as a result of its delays, and leaking of information, product and equipment sources increased their prices and put H&M in a precarious position.

102. The record shows that the Government created and openly admitted its contribution to the facts leading to and causing the alleged delays in H&M's contract performance, without excuse, and therefore the CO cannot create the complained of situation, or even contribute in part to facts leading to the default, but then simultaneously claimed that there was no reasonable belief or likelihood that H&M could perform the entire contract requirements. See also *Lisbon Contractors, Inc*. v. U.S., 828 F.2d 759 (Fed. Cir. 1987).

103. The Government's admitted delays in responding to H&M's request for information were not excusable thus avoiding any defense for the Government.

104. By the Government's own admission of delays, even if concurrent delays are then caused by H&M which were directly resulting from the Government's own unclean hands, the termination for default cannot stand. The CO's stated in its January 22, 2021 letter that "… while we assume some partial responsibility on providing timely responses, your firm bears the brunt of responsibility for the delayed and performance deficiencies…" This statement has no place in law when deciding by the CO that H&M should be defaulted. See also *Tobe Deutschmann Labs.*, NASABCA 73, 66-1 BCA ¶ 5413, 9 GC ¶ 62.

105. Under this record, there is no nexus between the Government's decision to terminate for default and H&M's performance because any default alleged from the CO was a direct domino effect from the Government's unreasonable and unexcused failure to provide critical information to H&M.

106. The Government's only action was to unilaterally and arbitrarily extend the contract performance period – a remedy for excusable delays. The Government's admitted delays were not excusable, especially when knowing that such delay directly impacted H&M's ability to perform.

107.  H&M had a reasonable expectation it would have the opportunity to provide the services it has contracted for with the Government at the agreed upon price for the prescribed contract period.

108. At all times during these events, had the Government responded in time to all RFI's, H&M maintained that it was ready, willing and able to perform the contract.

109. From the date of contractual award through the date of termination, the Government failed to provide H&M crucial technical information in a timely manner.

110. Despite being in possession or providing H&M additional access to acquire the crucial information, the CO simply refused to provide the information, and stated that H&M should have received the information from a site visit when in fact the photos provided by the Government were illegible. This was never disputed or even addressed by the Defendant.

111. During the performance of the contract, Defendant acknowledged receipt of H&M's repeated requests for information that was directly relevant to its successful performance and offered to follow up with answers to those inquiries.

112. The contract documents unambiguously place design and all responsibility on the contractor. However, H&M argues that this does not excuse the Government from providing important and material information to the contractor that the contractor does not have and needs to perform the contract.

113. The Government's acknowledgment and promises to respond suggest that H&M's interpretations were reasonable. See also *SAE/American-Mid Atlantic, Inc. v. General Services Admin.*, 98-2 BCA P 30084 (1998)

114. Inquiries made by H&M were good faith queries and material to performance of the contract.

115. Any ambiguities that the Government may raise should be held against it as the drafter.

116. Based on this, Defendant breached its duty not to interfere with the Plaintiff's performance under the contract. The CO was aware of these activities, but acted unreasonably under the circumstances, and could show no good grounds and no solid evidence to support the termination. His actions directly affected Plaintiff's ability to perform under the contract.

117.  Defendant is liable for damages because the evidence suggests that its actions were specifically designed to redirect the Plaintiff's work to under the contract to another party.

<u>CAUSE IV (Plaintiff's Default Was Excused)</u>

118. Plaintiff re-alleges and incorporates by reference the paragraphs set forth above as if each were separately restated here.

119.  The CO's termination was "beyond the control and without the fault or negligence" of the contractor.

120.  H&M argues that its default should be excused for either of several reasons:

**Defective Specifications, Excusable Delays, Commercial Impracticable and Impossibility**

121.  H&M's duty to perform should be excused because of defective specifications furnished by the Government that also had inconsistencies, incomplete and legibility problems, among other things also violated the implied warranty of Government-furnished specifications.

122. The record shows at a minimum that H&M advised the Government of legibility problems with the provided photos, and a lack of needed information that was material to H&M's performance.

123. Under the facts of this case, the limited and illegible information already provided to H&M without the additional requested information could not have resulted in acceptable contract performance.

124.  Without the requested information H&M could not have performed and could not have put forth acceptable contract performance. Thus, effectively the Government made H&M's performance under the contract impossible because the Government failed to provide the critical information H&M needed to perform.

125. The Government failure to provide adequate specifications, despite repeated requests, and the Government's admissions of delay are tantamount to defective specification which resulted in a "constructive change" to the contract entitling H&M to an equitable adjustment (which the CO openly refused) for additional time and money expended to comply with the defective specification. The Government actions, and inactions made performance impossible or commercially impracticable given the price hikes when information was also leaked to the very same suppliers and participants to H&M's performance.

126. Under these circumstances, the performance demanded by the CO was commercially impracticable because the performance required once the contract was awarded was vastly different from that originally contemplated contract by the parties. Yet, the CO completely ignored this assessment.

127. In its letter of concern, the CO actually told H&M that it was expected to accelerate performance to mitigate unsatisfactory progress. This constituted a change in contract performance.

128. Given the Government's actions and inactions, and despite repeated pleadings and warnings from H&M, the Government's admitted inexcusable delays created a change in performance that results in significantly greater costs or time for contract performance. These are risks that H&M did not assume.  See also *Appeal of Turbine Aviation*, 98-2 BCA P 29945 (1998).

129.  Under the facts of this case, no one can perform without the needed information and H&M did not assume the risk of impossibility.

130.  The record shows that based on presentations at the walk through, and written communication between H&M and the Government, critical information was needed and not provided in time to H&M.

131.  The defective specifications resulted in a "constructive change" to the contract entitling H&M at a minimum to an equitable adjustment for the additional time.

132.  First, the CO materially breached the contract by failing to cooperate with H&M when it repeatedly requested information from the Government. The CO should have reasonably known that failure to provide the requested information would cause delays and H&M to not meet the required schedule.

133.  H&M repeatedly requested information critical to its performance from the Government. The Government's failure to respond in a timely and reasonably fashion was not foreseeable by H&M and any contractor in this position. As a result, the delays caused was beyond the control of H&M and without the fault or negligence of H&M.

134.  Without that requested information the Government prevented H&M from timely performing the contract under its terms. The information requested of the Government was required for H&M to have performed on schedule. When the Government failed to provide this information, the entire project was delayed from its critical path.

135.  The CO's allegations that H&M failed to demonstrate adequate performance or intent to continue performance is unreasonable and not supported by the record

136.  Second, the Government's admitted delays were also excusable to H&M. The Government's failure to provide the requested information and the Government's knowledge that the requested information was necessary to perform the contract also created excusable delays. The Government had a duty to provide to H&M the requested information.

137.  The Government failed to consider the delays it caused and its failure to consider these delays – Plaintiff argues - "legally constitutes an abuse of discretion and arbitrary and capricious behavior, which makes the termination for default invalid."

## CAUSE V (Failure to Cooperate)

138. Plaintiff re-alleges and incorporates by reference the paragraphs set forth above as if each were separately restated here.

139. The Government breached its contractual duty to cooperate with its contractors and duty not to hinder their performance. See *Appeal of Turbine Aviation*, 98-2 BCA P 29945 (1998) (citing *Malone v. United States*, 849 F.2d 1441, 1445-46 (Fed. Cir. 1988).

140. The Government failed to cooperate by failing in its duty to clarify specifications after valid requests from contractors.

141. The Government provided insufficient information in the drawings and information provided to H&M causing H&M to make additional inquiries to the Government.

142. The information provided by the Government was incomplete with regards to, among other things dimensions, size, supply and return temperatures of chillers. Make and model numbers of motors that needed to be replaced or repaired (model numbers were unreadable from photos provided).

143. H&M sent numerous requests to get the information from the Government.

144. The Government acknowledged receipt of H&M's requests and promised to get back to them.

145. Information was critical meet the project deadlines.

146. Delays resulting from the time required to clarify and provide critical information to H&M were not the H&M's fault.

147. The Government cannot take a hands-off approach and then shift complete responsibility to H&M when in fact the government acknowledged receipt of H&M's critical questions. See *SAE/American-Mid Atlantic, Inc. v. General Services Admin*., 98-2 BCA P 30084 (1998).

> ("… we cannot subscribe to GSA's argument that the design
> responsibility for the tie anchor system for the exterior veneer and
> for the flashing installation was shifted to the contractor…)

148. Viewed together with the Government's admitted delays, said delays are directly related to

adversely affecting H&M's ability to meet the CO's revised delivery schedule. In order for

H&M to successfully perform, it needed the information regarding dimensions, size, supply and

return temperatures of chillers and model numbers of motors at a minimum which were not

legible from phots provided by the Government.

149. None of the additional information would have been discoverable on a site visit as the CO

conveniently alluded to. Based on this, H&M should be entitled to relief.

## VI.   PRAYER FOR RELIEF

150.  Wherefore, Plaintiff respectfully request the Court to grant judgment for Plaintiff in this

appeal and to order the following relief:

151.  Convert the termination for default under contract number FA301620C0116 to a

termination for convenience.

152.  Rule that the Government's wrongful termination for default claim implicates the H&M's

right to obtain termination for convenience costs. See *Malone v. United States*, 849 F.2d 1441,

1445 (Fed. Cir.) ("If the default was improper, the government is liable for the contractor's

termination for convenience costs.") (citation omitted), modified on other grounds, 857 F.2d 787

(Fed. Cir. 1988).

153.  Rule that the Government's delays were not excusable and directly caused H&M's delays.

154. Rule that the Government's extension of the contract for 37 days was self-serving since the Government's own actions were not excusable and H&M deserved a more reasonable time to perform.

155. Rule that the Government is not entitled to reprocurement costs or liquidated damages.

156. Award lost profits, breach damages, and fees under contract no. FA301620C0116.

157. Award damages for the Government's breach of its duty of good faith and fair dealing and breach of contract to allow H&M its profits lost and costs.

158. Award attorney's fees and costs under the Equal Access to Justice Act, *as amended*.

159. Any such further and other relief as the Board may deem just and proper.

Respectfully submitted,

THEODORE P. WATSON
*s/Theodore P. Watson*
Watson & Associates LLC
Colorado Bar No.: 34908
10200 East Girard Ave, Suite C250
Denver, Colorado 80231
Telephone: (720) 941-7200
Fax: (720) 941-7201
watsont@theodorewatson.com

*s/Wojciech Z. Kornacki*
Wojciech Z. Kornacki, Esq.
Watson & Associates, LLC, *Of Counsel*
1629 K Street N.W., Suite 300
Washington, D.C. 20006
Telephone: 202-827-9750
kornackiw@theodorewatson.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 3, 2022, a copy of the foregoing "Complaint" was filed electronically via www.pacer.gov. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

THEODORE P. WATSON
*s/Theodore P. Watson*
Watson & Associates LLC